MONCURE, J.,
delivered the opinion of the court. After stating' the case he proceeded :
The plaintiff prayed for and obtained an appeal from the decrees made in the cause, or such of them as he complained of in his petition, assigning many errors therein, which we will proceed to consider. *And first he complains of the decree of July 29th, 1856, as erroneous in several respects, as first in sustaining the exception of the defendants to the commissioner’s report; second, in deciding that the bill- of the plaintiff was a bill of discovery; and third, in regard to the principles ■ and extent of the liability of the defendants for the collaterals which went into their hands, as declared by the court.
The exception to the commissioner’s report .was that in statirig the account he rejected as testimony, the answers, of the defendants and the exhibit filed therewith. There is nothing better settled .than that where the answer is responsive to the bill, it is to be taken as true, unless it be contradicted by two witnesses or by one witness and corroborating circumstances. 2 Tuck; Com. book 3, p. 502, and cases cited.. The rule is thus broadly laid down by Story: “In every case the answer of the defendant to a bill filed against him upon any matter stated in the bill and responsive to it, 'is evidence in' his own favor. Nay, the doctrine of equity goes farther, for not only is such an answer proof in favor ' of defendant, as to the matters of fact of which the bill seeks a 'disclosure from him; but it is conclusive in his favor, unless it is overcome by the satisfactory testimony of two opposing witnesses, or of one witness corroborated by other circumstances and facts, which give to it a greater weight than the answer, or which are equivalent in weight to a second witness.” 2 Story’s E.q. (S1528. In the absence of such opposing testimony, the court will neither make a decree, nor send 'the case' to be 'tried at law; but will simply dismiss the bill. Id. This is strongly illustrated by two cases recently decided by this court, in each of which a decree in favor of the plaintiff in such a case was reversed, because the court below, instead, of ordering an issue, ought to have dismissed the bill. Wise v. Lamb, 9 Gratt. 294; Smith v. Betty, 11 Id. 752.
*The rule not only applies where a material allegation of the bill is denied by the answer, but also where a material disclosure is called for by the bill and made by the answer. The answer is as much responsive to the bill in the latter as in the former case, and comes as plainly within the very terms of the rule. Nor is the rule in regard to the effect of such a disclosure confined to an answer to .a bill of discovery, technically so called, or a pure bill of discovery, as it is sometimes called. As to the nature of such a bill, see McFarland v. Hunter, 8 Leigh 489, and the authorities cited; 1 Story’s Eq. H 64, 74; 2 Id. 690, 1483. Indeed the rule cannot be said to be applicable at all to such a bill, for the answer to it is conclusive, in the case at least in which it is filed, and cannot be overthrown by any amount of countervailing testimony. But every bill requiring an answer is-more or less a bill of discover}*. 1 Mad. Ch. 196. “Every bill in equity,” says Story, “may properly be deemed a bill of discovery, since it seeks a disclosure from the defendant, on his oath, of the truth of the circumstances constituting the plaintiff’s case, -as propounded in his bill.” 2 Story’s Eq. §2 689, 1483. The defendant is entitled to the benefit of his answer as evidence in the cause, if the bill be filed for relief, and the plaintiff cannot, even by expressly waiving a discovery, deprive him of it. Thornton v. Gordon, 2 Rob. R. 719, 727. Judge Allen, in his opinion in the case (in which, so far as relates to this question, the rest of the court concurred), said: “To whatever source the rule is traced, it is firmly, established as one o.f the fundamental principles of a court of equity. It is the law of the forum, and all who apply to it for relief must submit to have their cause tried according to its established modes of procedure. It would be as competent for this court .to remodel the whole doctrine of the court of ^equity in regard to pleadings and evidence, as to declare that, in this particular case, the defendant should be deprived of his answer. The cases do not confine this privilege to, answers to ((bills seeking a discovery. In truth, the rule has no application to a mere .technical bill of discovery, where no relief is prayed, but the discovery is required to be used in some trial at law: for there the plaintiff has his election to use the answer or not. The principle becomes of importance in those cases alone where an issue of fact is to be tried by the court.”. Id. 725-6.
The learned judge of the court below surely did not mean to say that the bill in this case was a pure or technical bill of discovery, but that it was a bill of discovery in a general'-sense ; dhat. is, not only a -.bill in equity, and therefore a bill of discovery, but a bill in equity calling for a discovery. In ascertaining his meaning, we must take into, view all that he said, and look at the case as it was when he made the decree. At that time there was nothing in the case but the bill, answer and replication (besides three depositions taken by the plaintiff, but not affecting the .question), and in that state of the case the answer, so far as it was responsive to the bill, was conclusive; just as much so as if the bill (had been a pure bill of discovery. “The bill filed by the plaintiff,” said the court, “is virtually a bill for discovery ; and the answer of the defendants, being responsive to the bill and not excepted to, should be taken as true in regard to the matter discovered by it. At all events, it' must be taken as true ttn *329 less disproved by two witnesses, or by one witness and pregnant circumstances. There is no proof, other than what may be in the accounts exhibited, to show on the part of the plaintiff,” &c. In this view of the subject, there is no error or even inaccuracy in what was said by the court in regard to a bill of discovery, *and the case was expressly subjected to the operation of the rule we have been considering. So that in no view has there been any error in this respect to the prejudice of the plaintiff.
The rule in question being well settled, its application to this case is very clear. The plaintiff in his bill, after stating his case, says he is “advised that he is wholly without remedy for bringing about the settlement as aforesaid, and any means of causing the said Miller & Mayhew to disclose, show and account for the notes, bonds and claimsjtransferred and assigned to them as aforesaid, without the aid of this court;” and he prays “that they shall fully disclose and show all that they have done in the premises,” and may be “required on oath to answer all the statements and allegations of the bill,” and “to settle the account and make the disclosures as aforesaid.” The answer throughout, including the exhibit filed therewith, so far as they relate to the collaterals, is responsive to the bill, and is therefore, under the rule before stated, evidence for the defendants, and conclusive, in their favor except so far as it may have been overcome by the evidence of two witnesses or of one witness and corroborating circumstances.
But it was argued by the plaintiff’s counsel, that the answer contradicts itself and is contradicted by the evidence in several material respects, and its credit as evidence was thus entirely destroyed, even when directly responsive to the bill: and 2 Tuck. Com. book 3, ch. 22, p. 503, and East India Co. v. Donald, 9 Ves. R. 275, are relied on to sustain the argument.
Very little evidence had been taken on either side when the decree of the 29th of July, 1856, was rendered, and the correctness of that decree when rendered cannot depend upon the evidence afterwards taken. But as that after evidence might affect the weight of the answer as ^evidence before the commissioner in taking the account under that decree, we will consider in this place how far the answer is affected by any evidence taken in the cause.
The passage referred to in Tucker’s Com. is in these words: “Where the answer is contradicted in any one or more important particulars by adequate evidence (i. e.. two witnesses or one and corroborating circumstances), it is deprived, in all other respects, of that weight which is allowed to answers by the rules of a court of equity: for, being falsified in one thing, no confidence can be placed in it as to others; according to the maxim, falsum in uno, falsum in omnibus. And the answer may in itself contain the circumstances giving greater credit to the testimony of the single witness (9 Yes. R. 275 ; 2 John. Ch. R. 94) ; or destroying its own credibility; as where it is plainly contradictory in itself.”
. Certainly the learned author did not mean to say that a mere contradiction of an answer in a material respect, either by other evidence or by itself, would wholly discredit the answer in all other respects as evidence in the cause. The most he could have intended to say was, that if any part of the answer is proved or shown to be wilfully false, the whole is thereby discredited and destroyed as evidence for the defendant in the cause.
But is the position true, even to that extent? The cases cited by Judge Tucker do not sustain the position to that extent, and were probably only cited in support of the latter part of the passage, that “the answer may in itself contain the circumstances giving greater credit to the testimony of the single witness,” which they fully sustain. They are the cases of The East India Co. v. Donald, 9 Ves. 275, and Hart v. Ten Eyck, 2 John. Ch. R. 62. The latter is chiefly important to show that where the defendant admits a fact charged in the bill *and insists upon a distinct fact by way of evidence, he must prove the fact so insisted on in defence. The plaintiff cannot destroy the weight of the whole answer by proving that the defendant is unworthy of credit; nor can be, indirectly, do so by proving that the answer is false in one respect, or several respects; the only effect of such proof being to destroy the weight of the answer to the extent to which it is disproved by that amount of evidence which is required by the rule in chancery. It is a general rule, applicable alike to courts of law and equity, that a party will not be permitted to produce general evidence to. discredit his own witness. 1 Phil. Ev. 308. But if a witness state facts against the interest of the party that called him, another witness may be called by the same party to disprove those facts; for such facts are evidence in the cause, and the other witness is not called directly to discredit the first, but the impeachment of his credit is incidental only, -and consequential. Id. 309; Bull. N. P. 297; Cowen & Hill’s notes to Phil. Ev. part 1, notes 535 and 536. Where a party calls a second witness to contradict a fact which his first witness has sworn to, the whole of the first testimony is not therefore to be repudiated. Id. Bradley v. Ricardo, 8 Bing. R. 57, 21 Eng. C. L. R. 220.
If it be true, however, that proof of falsehood of the answer in one or more respects destroys its weight as evidence in the cause in all, still there is no such proof in this case, either in the answer itself, or the evidence, or both combined, and at most nothing more than a mere conflict of evidence which may well be accounted for without imputing falsehood or wilful misstatement to any person.
It may be proper to notice here the difference between the effect of an answer to a *330 technical bill of discovery and an answer to other bills in equity, as matter of evidence *for the defendant. We have seen what is its effect in the latter case, and what amount of countervailing evidence is required to overthrow it. In the former case, where the discovery is sought to be used in an action at law, the party obtaining it has his election to use it or not in the trial at law, and if used it is used as matter of evidence, the whole of which is to be read as the testimony of a witness, including not only admissions against the interest of the respondent, but all assertions in his favor, subject, however, to be credited or discredited, in whole or in part, by the court or jury, according to its own intrinsic weight, or its relative weight in comparison or connection with the other evidence in the action at law. In such a case the chancery cause terminates “with the discovery obtained or the failure to obtain it” (Lyons v. Miller, 6 Gratt. 427, 438); and of course the answer is conclusive in the court of chancery. In England, where discovery is the only ground of equity jurisdiction in a case, generally relief is hot prayed by the bill, but the discovery is sought to be used in an action at law. “With us the general rule is the other way, the court of equity retaining the cause after the discovery is obtained, and proceeding to give the proper relief founded upon it; instead of turning the parties over to a common law tribunal in order that the answer may be used as evidence there.” Id. Where the court of equity retains the cause and proceeds to give the proper relief, it acts as a substitute for the court of law; and gives the same effect to the answer that would be given to it in that cour.t. Id. It would seem, however, with this difference,' that-in the court of equity, the only ground of jurisdiction being the necessity for a discovery, the plaintiff cannot contradict the answer by other evidence, as he would thereby prove himself out of court. But in other respects the .effect would be the same in each forum. In t;he present case a court of equity *has jurisdiction independently of the ground of discovery, and the effect of the answer as evidence for the defendants is therefore governed by the ordinary rule of equity in such a case; but if it were governed by the rule which applies to a technical bill of discovery, as laid down in Lyons v. Miller, supra, the result in this case would, we believe, be precisely the same.
The principles declared by a majority of the judges who decided the case of Mertens v. Nottebohms, 4 Gratt. 163, would give to the account given by the defendants in their answer, in regard to the collaterals placed in their hands by the plaintiff, the effect of prima facie evidence of its correctness, independently of the rules before referred to. It was there held that an account of sales rendered by a consignee to a consignor is prima facie evidence of its correctness. “I take it to be correct as a general proposition,” said Judge Baldwin, “that in the case of a factor, agent, trustee or executor, whose duty it is by law or by contract, to sell and account for the proceeds of goods in his hands, and who makes a dpe return of his sales to the proper person or the proper custody, he may rely upon the same as prima facie evidence in his favor; inasmuch as he is bound not only to sell, but to keep and render an account of his sales. It is for the benefit of persons interested in the proceeds that this duty should be performed, and when performed it is unreasonable that they should have the power of rendering it wholly nugatory, and throw upon the agent, &c., the task of furnishing evidence in relation to the transaction, which ma3r involve minute details difScult of proof. ” Id. 168. The views of Cabell) P., were to the same effect. Id. 175. The application of these principles to this case would, we believe, conduct us to the same result to which we are brought by the application of the ordinary rule of equity before referred to.
*And now in regard to the principles and extent of the ' liability of the defendants for the collaterals which went into their hands, as declared by the court in the decree of July 29th, 1856.
There was no written agreement between the plaintiff and defendants setting out the duties and obligations assumed by the latter in regard to these collaterals, nor were those duties and obligations the subject of any express parol agreement between the parties. The only written evidence of the terms on which the collaterals were placed in the hands of the defendants consists of two papers filed in the cause, one as exhibit W filed with Hawkins’ first deposition, being a statement of four notes of $2,500 each, discounted by the defendants for the plaintiff on the 31st of May," 1850, under which is written a receipt-signed by the defendant in these words: “As collateral security for the payment of the above described notes, and also other notes that we hold, we have received of Messrs. E. L. Eant & Co. bills receivable and open accounts which are recorded in two books in our possession, a statement of which they have;” and the other, as exhibit L filed with the deposition of John W. Ball, being a receipt signed by the plaintiff in the name of E. L. Eant & Co. in these words: “Received, Baltimore, June 4th, 1850, of Miller & May-hew, $2,095.28, being the proceeds of my two notes in our favor for $1,500 each, dated May 4 and 9, at seven months, discounted by them for our use, for the security of which I have placed in their hands collateral security, a copy of which we have. In consideration of the facilities granted by them, they are to hold the said securities or the proceeds thereof, for the payment of all notes," open accounts, borrowed money now due them, or to fall due, or any that they’ may hereafter hold. ” A nd yet those papers, together with the evidence which the record ^affords of the relation of the parties to, and their dealings with, each other, and of the usages among mer *331 chants in such cases, leave no room for doubt as to what were the rights, duties, and obligations of the parties in regard to the collaterals. Both parties were dry goods merchants in Baltimore. The defendants were wholesale dealers, and the plaintiff was a jobber, extensively engaged in selling goods to retail merchants throughout the surrounding country. He had little or no capital, and for the purpose of continuing to carry on his business, made an arrangement with the defendants to obtain accommodations from them from time to time, in the form of loans and discounts and sales of goods, on the terms of placing the bonds, notes and accounts of his customers in their hands as collateral security. So long as he continued to carry on his business, it was not expected or intended that the defendants were to do more than continue to hold the credits thus placed in their hands, as collateral security, receiving the amount of such as might from time to time be paid to them, but taking no steps to enforce such payment, nor even to notify the collateral debtors of the assignment of their debts. To have taken such steps would have injured the credit of the plaintiff and defeated the object which he had in view. Collections or renewals of the collaterals during that period, as they might become necessary or convenient or proper, were no doubt intended to be made through the agency, of the plaintiff, upon his paying or delivering to the defendants the money collected or the renewed notes, or substituting other and equally good notes for any that might be withdrawn for the purpose of collection or renewal. It could not have been intended that the plaintiff should be authorized to collect, or renew, or otherwise deal with the collaterals, on any other terms than as aforesaid; for the existence of such an authority would *have been destructive of the security, and made the transaction nothing more than a contract founded on the personal credit of the plaintiff. To be sure, the defendants, by not giving to the collateral debtors due notice of the assignment of their debts, incurred the jrisk of loss by means of the plaintiff’s collecting such debts and appropriating the same to his own use without accounting to them therefor, but they could not have intended to authorize him to do so. The plaintiff says that after May, 1850, when the arrangement was made with the defendants and most of the collaterals were placed in their hands, he placed other col-laterals in their hands to a large amount, which much more than covered the whole amount of his collections. But it does not appear that any of those other collaterals were placed in the defendants’ hands on any other account than as security for new loans and discounts, which were from time to time made by the defendants for the plaintiff, or as substitutes for notes from time to time withdrawn by him from their hands. It was the obvious duty of the plaintiff to collect no collateral until he had withdrawn it from the defendants’ hands, or, if he undertook to make such collection, he ought at once to have handed the amount collected to the defendants. Instead of which it appears that at the time of his failure on the 6th of November, 1850, they had in their hands collaterals to the nominal amount of about sixty-nine thousand dollars, which they were authorized to suppose were wholly due and unpaid, when in fact a large amount of them, amounting in all to about eighteen thousand dollars, had been collected b3r the plaintiff without having rendered any account thereof; and a few days before the plaintiff’s failure he was furnished by the defendants with a list of the collaterals then in their hands, embracing those which had been collected by him as aforesaid, but it does not appear that even *then he gave them any information of any of his said collections.
Such were the transactions between the parties which occurred before, and such was the state of things which existed at the time of the plaintiff’s failure. Then new rights, duties and obligations arose between them, springing from their relation to each other and the altered condition of the plaintiff. What those rights, duties and obligations were, we will now proceed to consider.
The plaintiff’s failure occurred on the 6th of November, 1850. He then owed the defendants about $34,000; and their only means of payment were the collaterals then in 'their hands, amounting nominally to $69,760.94, including fifteen, amounting to $3,096.93, which on that day and a few days before appear to have been returned to the plaintiff. What the condition of these collaterals was; what proportion and which of them were due by insolvents, or had been collected by the plaintiff, the defendants did not know. It became then their right and their duty to collect, as far and as soon as they could, all of the said collaterals remaining in their hands, apply the nett proceeds to the payment of their claim against the plaintiff, and pay him the surplus, if any: and they were bound to use due diligence in the performance of their said duty. In other words, they were bound to use common or ordinary diligence, such as a man of business and of common prudence would exercise about his own affairs in the situation in which the defendants were then placed. They were not then mere pledgees of the collaterals, but they were assignees, bound to use the diligence due by an assignee under the circumstances. They were not only principals, as being themselves interested in the subject, but they were also agents of the plaintiff to the extent of his interest, and bound to perform the duty pertaining to such agency. The object of *their duty was, to realize out of the collaterals as much as possible at the earliest practicable period; and they were invested with all the powers which were necessary or proper to enable them to attain that object. The first thing to be looked to was the security of the collaterals, and the next their *332 collection. If a collateral was already secure, but was not paid on demand, it was their duty to bring suit upon it as early as convenient. If it was of doubtful solvency, and security could be obtained by giving reasonable time, it was their right if not their duty to give such time and obtain security. If a debtor could not, or would not, give security for his debt, and good policy required that he should not be sued, they were justifiable in not suing him. If more could be made by compounding or compromising a debt than in any other way, or if.-such a-compromise was' deemed advisable in the exercise of a sound discretion, looking to the interest of the creditor, they had a right to make such compromise. New securities taken by them in the discharge of their duties might properly be taken in their own names. In determining whether it would be good policy to bring no suit for a debt, or to give time for its payment on obtaining security, or to accept a compromise, the fact that they acted under the advice of, and upon information derived from, their counsel, affords at least prima facie evidence that such action’was bona fide and proper. They were assignees not of one debt or a few debts only, of the situation of which they had personal knowledge, but of several hundred debts due by persons living in different and distant places in four states, and when it became their duty to collect these debts they had. no knowledge whatever of the condition of the debtors, and had to depend or such information and advice as to the best course to be pursued upon the counsel they employed to make the collection. •
*There are the principles which seem properly to govern this case and to make out the duties which the defendants had to perform in regard to the collaterals. The best guaranty which could possibly have been given for the faithful performance of those duties consisted in the fact that the defendants were deeply interested in such performance. They were men of business, wide awake to their interest, and the presumption is,- they pursued it. If so, they probably did their duty. In some instances they may have had a countervailing interest which outweighed the other and swerved them from their duty; and in some, perhaps, they majr have given undue indulgence to the debtor, considering his debt to be safe. Their duty was to look not only to the safety of the debt, but to its prompt collection. It will be found, however, that, in the main, they used due diligence in the collection of the debts. They commenced writing to the debtors on the very day of the plaintiff’s failure, giving them notice of the assignment, and urging the necessity of immediate payment. They probably wrote such a letter to most, if not all, of the debtors, at or about that time, and placed the debts in the hands -of attorneys for collection as soon as convenient thereafter. And they continued to correspond with the debtors and the attorneys during the whole course of the collections, having, before the time of filing their answer, as they state therein, written over six hundred of such letters, many of which are to be found in the record.
We have applied the foregoing principles to the decision of this case, and to the extent to which they are variant from the principles declared by the decree of July 29, 1856, to which extent we consider that decree erroneous, we have thus corrected the consequences, if any, which may have resulted from such error to the prejudice of the plaintiff.
*The next error complained of is, that the court did not overrule the action of the commissioner in granting a continuance on the 1st of April, 1857, and decide the case upon his report made on the 20th of April, 1857.
A commissioner, properly, has much latitude of discretion in granting continuances of proceedings before him, and the court whose order he is executing will not overrule his action in that respect unless it be plainly erroneous. Still less will an appellate court reverse - a decree for that cause.’ If such a reversal would in any case be proper, it certainly is not in this. We think there were good- grounds for the continuance, and that it was properly granted by the commissioner. '
The next complaint is, that the court erred in granting leave to retake the deposition of William Hawkins ;■ and 2 Daniels Ch. Pr. -pp. 1150-’6, sec. 9, is cited in support -of this assignment of error.
There is greater strictness in England than in this state in permitting the deposition of a witness to be retaken, arising from the difference in the practice of the two countries in regard to the mode of taking depositions. It may however be said here as well as in England, that “the court is always desirous that the examination of witnesses should be completed as much as possible, uno actu, and that whenever it can be accomplished, no opportunity should be offered, after a witness has once signed his deposition, and turned his back upon the examiner, of tampering with him, and inducing him to retract or contradict or explain away what he has stated in his first examination upon the record. But notwithstanding this unwillingness to allow a second examination of the same witness, there are cases in which, if justice requires that a second examination of the same witnesses should take place, an order will be made to permit it.” Id. p. 1150. In the 9th section, before referred to, are collected many *cases, in which a re-examination of a witness was ordered in that country. In this case the motion to retake the deposition was founded upon the affidavits of the attorneys for the defendants, which are stated in the order to be filed, but do not appear in the record. It might therefore properly be inferred, in the absence of the affidavits, that the order was made upon good and sufficient grounds. But it otherwise plainly appears from the record, that the retaking of the deposition was proper, *333 and indeed necessary. The case involved a great number of questions, in regard to a great variety of transactions. Several hundred collaterals had been placed by the plaintiff in the defendants’ hands, and their liability for such of these collaterals as had not been collected and credited or otherwise accounted for by the defendants to the satisfaction of the plaintiff, was the main subject of controversy in the suit. The witness Hawkins was the cashier and chief book-keeper of the defendants during all the time the transactions in regard to the collaterals were going on, and had special charge of the collection thereof. The materiality of his evidence, in the whole case and almost every step of it, was palpable. It was impossible to examine him so fully when his first deposition was taken as to render any further or other examination unnecessary. When his first deposition was taken, in November, 1856, only six depositions had been taken by the plaintiff. It was then impossible for the defendants to anticipate what other depositions would afterwards be taken by the plaintiff, or what particular liabilities he would attempt to fix upon them. Between that time and the 9th of September, 1857, when leave was granted to retake the deposition of Hawkins, twenty-four additional depositions were taken by the plaintiff, many exhibits were filed by him, the commissioner made a special report at his instance, and he filed various exceptions ^thereto ; thus developing, in these different ways, the claims he intended to assert against the defendants. They had a right to defend themselves against these claims by countervailing testimony, and the best, if not the only means of doing so was, by a re-examination of their witness Hawkins. The importance of this witness and the materiality of his evidence, even to the plaintiff, is demonstrated by the great extent of his examination on both sides, and especially on the side of the plaintiff, and the great number of exhibits filed with his depositions, derived chiefly from the books and papers of the defendants. His first deposition and exhibits filed therewith occupy forty-seven pages of the printed record, and contain answers to eleven questions propounded by the defendants, and one hundred and eighteen by the plaintiff. His second deposition and the exhibits filed therewith occupy one hundred and seventy-seven pages of the record and contain answers to eighty-one questions propounded by the defendants, and two hundred and eighteen by the plaintiff. Many, if not most, of the questions propounded by the plaintiff had nothing to do with the cross-examination of the witness, but were framed with the view of obtaining original evidence for the plaintiff. The object of the defendants in obtaining leave to re-examine the witness was, not to afford him an opportunity “to retract, or contradict, or explain away” what he had stated in his first examination, but to prove facts rendered necessary to their defence by the action of the plaintiff since the first deposition was taken, and which could not be proved by any other witness. According to the strictest construction of the rules of equity practice, there is none which forbids the re-examination of the witness under such circumstances and for such a purpose. To guard against any possible abuse, the court in granting leave to the defendants to retake the deposition of Hawkins, ^directed that they should not examine him as to any matters upon which he had been examined by either party in the cause, and that the retaking of the deposition should be completed on or before the 10th day of October, 1857. We therefore think the court did not err in granting such leave.
Fven if this court differed from the Circuit court in regard to the propriety of granting such leave, it would not afford just ground for reversing the decree, at least unless it was palpably improper to grant such leave; as the Circuit court ought to possess much latitude of discretion in the decision of such questions.
But it is argued that even if the court properly permitted the deposition to be retaken it cannot be relied upon as evidence against the plaintiff for several reasons.
First, because the re-examination was altogether upon the same matters on which the witness was examined in taking his first deposition. Certainly this objection is not well founded, in its whole extent. The reexamination was upon many matters not involved in the first, even if it can be said that any of the matters to which the re-examination'relates were matters upon which he had been previously examined, within the meaning of the order. It is believed that none of the many interrogatories propounded to the witness in taking his first deposition were repropounded to him, at least by the defendants, in taking his second deposition; and that no interrogatory propounded to him by the defendants in taking his second deposition was intended by them, or in any manner tended to induce him to alter, retract, contradict, or explain away, anything that he had stated on his first examination: and thus the chief, if not the only, object which the court had in view in the guarded terms of the order, has in fact been attained. At all events we think that the limitation imposed on the defendants in retaking *the deposition, should not have exceeded that extent. In any other view it would be difficult for this court to compare the deposition, and determine how far and in what respects they can be said to be upon the same matters. All the matters involved in the suit are perhaps dependent upon some common principle or facts as to which they may, in a general sense, be said to be the same matters. The defendants seem to have acted bona fide in retaking the deposition of their chief witness. When they filed their answer and exhibit, which were evidence in their favor, they were ready for trial. The plaintiff took some evidence in *334 opposition to the answer, which made it necessary for the defendants to take the first deposition of Hawkins; when they were again ready for trial. The plaintiff then took and exhibited a great deal more evidence, which made it necessary for the defendants to retake the deposition of Hawkins; in doing which it was difficult from the very nature of the cases to avoid occupying to some extent the same ground which had been occupied in taking the first deposition. The plaintiff observed no limits in his re-examination of this witness, and it was but fair and reasonable that the defendants should be equally free from restraint, taking care, however, as they did, not to ask any question with a view, or tending to induce the witness to alter, retract, contradict or explain away, anything stated by him on his former examination.
Secondly — Because he could not testify on his own memory, without the aid of his memoranda. “A witness may be permitted to use such short notes as he brings with him to refresh his memory, but not the substance of his deposition; nor may he transcribe such notes verbatim.” Thus the law is laid down in 2 Dan. Ch. Pr. 1062. A witness ought not to write his deposition or his answers beforehand, nor ought they to be written for *him beforehand by counsel or any other person, but he ought to answer the questions orally and from memory as they are propounded to him. Parties or their counsel may, orally or bj' writing, previous to his examination, direct his attention to the facts in regard to which he is intended to be examined, and he may refresh his memory in regard to such facts by examining books and papers, and make memoranda from them and otherwise, especially of dates and amounts, and use such memoranda, for the purpose only of refreshing his memory, at the time of giving his evidence. The memoranda themselves are not evidence, and, a fortiori, what he says of their contents is not, unless he remembers the facts after his memory is refreshed. The books and papers referred to may be evidence, and if so and it be desired to use them they must be produced, or secondary evidence be given of their contents after laying the proper foundation for such evidence. In this case it was necessary, from the very nature of the case, and the number and extent of the transactions involved in it, and the intimate connection of the witness with them, and the lapse of time between their occurrence and the date of the deposition (a period of seven years), that the attention of the witness should be directed to the facts as to which he was to be examined, that he should refer to the books and papers relating to them and make memoranda, and that he should use these books, papers and memo-randa in giving testimony for the purpose of refreshing his memory. It does not appear that more than this was done, except once or twice the witness in giving his answer was reading from his memoranda, when he was at once checked and the paper taken from him. The error was a common and natural one, and seems to have proceeded from mistake and not evil design. It was corrected before it created any mischief. The books and ^papers referred to were present, and the plaintiff’s counsel caused such of them as he chose to be made evidence in the case.
Thirdly — Because the witness is not to be believed; his deposition showing a strong bias against the plaintiff, and being both contradictory in itself and contradicted by other evidence in the cause.
The feelings of the witness were certainly and naturally with the defendants, and doubtless influenced him to some extent in giving his evidence. The court in weighing it, must remember his close relation to the defendants, his agency for them in attending almost exclusively to the transactions involved in the suit, and his strong desire for their success in the result. We have accordingly done so, and we find nothing in the evidence which cannot be justly and properly accounted for without attributing to the witness any intention to tell a falsehood or to suppress the truth. We could not give as much weight to his testimony as we would to that of an impartial witness, but there is certainly nothing in the record to warrant us in discrediting and disregarding it altogether. With these remarks we deem it unnecessary to review in detail all the numerous instances referred to by the counsel for the plaintiff under this head of objection to the testimony of this witness.
The remaining assignments of error relate to the exceptions to the commissioner’s report, but before we proceed to notice them in detail it will be convenient to state one or two rules of practice which have a material bearing on some of the said exceptions; and,
Hirst, in regard to a notice to take depositions on the same day at two different places so far distant, the one from the other, that the party cannot attend at both. Is such a notice sufficient, and ought not an exception taken to the depositions on that ground to be sustained? *This question has never been expressly decided by this court, but it was in effect decided in Unis and als. v. Charlton’s adm’r and als., 12 Gratt. 484, 498, in which case it was held that a deposition taken at so late a day that the other party cannot attend at the time and place of taking it, and then get to the court where the cause in which it is taken is to be tried, by the commencement of the term, is not admissible in evidence. Judge Daniel in delivering his opinion in that case, in which the other judges concurred, said: “The defendants had a right to be present at court as well as at the taking of the depositions.” But the question has been expressly decided in some of the other States. In Waters’ heirs v. Harrison and wife, 4 Bibb’s R. 87, it was held that such a notice was not good, and that the deposi *335 tions taken at either place could not be used, the party to whom the notice was given having attended at neither place. Chief Justice Boyle, in delivering the opinion of the court, well remarked that a notice which precludes the party from attending to it, unless by an agent, is not reasonable. “Though the law allows a man the privilege of acting by his agent it never compels him to do so.” In Hankinson and al. v. Lombard, 25 Illinois R. 572, it was held that if a party gives notice of the taking of several depositions at different places, on the same day, so that the opposing party cannot be present to cross-examine all the witnesses, he may select which examination he will attend, and the other depositions will be suppressed. We think the principle on which these decisions rest is a sound one, viz: that a party has a right to be personally present when depositions are taken by his adversary, and that a notice which does not afford him an opportunity of being so is insufficient, and his exception to the depositions on that ground ought to be sustained. Whether the depositions taken at both places ought to be ^excluded, as was done in the case in Kentucky, or whether the party should be required to select which place he will attend, and be permitted to exclude only the depositions taken at the other place, as was done in the case in Illinois, majr be a question of doubt. But we think the latter is the better rule. When a party cannot attend both places at the same time it is no reason why he should not be required to attend either, and in giving him a right to select which of the two places he will attend, he has every advantage to which he is entitled. By making the selection he confines the notice to the place, selected, and makes it no notice at all as to the other place.
Secondly — In regard to exceptions merely taken by being endorsed on the depositions, or written on a separate piece of paper and filed in the cause, or taken and noticed on the face of the depositions in the progress of taking them, without being brought to the notice of the court below for the purpose of obtaining the judgment of the court thereon, of which exceptions a great many appear in the record in this case. There seems to have been no express decision of this court upon this question any more than upon the one we have just been considering. In Rowton v. Rowton, 1 Hen. & Mun. 94, 110, Judge Byons expresses an opinion which strongly applies to the question. “The affidavits,” he says, “although excepted to at the rules, were not objected to at the hearing, but allowed to be read, whereby the former exception was waived, and cannot now be repeated in this court.” In Beverley v. Brooke & als., 2 Leigh 425, there was an endorsement on the envelope of the deposition, in the handwriting of counsel, that he excepted to the reading of the deposition on account of the interest of the witness in the event of the cause; but it was not signed by the counsel, nor did it appear that the attention of the court *was called to the exception, or that the court decided upon it. “This would have presented a serious difficulty,” said the court, “had the deposition been taken under a general commission.” But the court was of opinion that the same difficulty did not exist in the case of a special commission, and accordingly considered the question of the competency of the witness and rejected his deposition on the ground that he was incompetent. 2 Rob. Pr. old ed., 337-8. In some of the other states the question has been expressly decided. In Scott, &c. v. Cook, &c. 4 Monr. R. 280, it was held that exceptions to depositions for want of notice and other irregularities must be called up and decided in the court below, otherwise it cannot be assigned for error that they were read. It is otherwise when the objection is for interest and incompetency to be proved by the facts in the cause. In Black v. Lamb, 1 Beasley’s R. 108, a case decided in the court of chancery of New Jersey, it was held that objections to testimony taken before the master are to be settled by the court, and if they are not renewed at the hearing, or when the depositions are acted upon by the court, they are waived. We approve the principle maintained in these cases, and are of opinion that an exception to a deposition (except upon the ground of incompetency, in which case no exception is necessary), not having been brought to the notice of the court below nor passed upon by that court, ought to be considered as having been waived, and cannot be noticed by this court; and that a general judgment or decree of the court below against the party making the exception cannot be considered as involving a decision upon the exception.
And thirdly — In regard to an exception taken by the plaintiff to the reading of any and .all letters from third persons to the defendants filed in the cause, as res inter alios acta, except such as he has made evidence b3' reading *them himself. This exception was not brought to the notice of the court below, and what has been already said on that subject will apply to it, at least to some extent, if not entirety. But in addition to that, the exception is too general. It was competent for the defendants to produce and prove letters addressed to and received by themselves from their attorneys, at least for some purposes; as for instance, to show that a claim had been put in the hands of an attorney for collection, and at what time and what advice he gave in regard to it. The sweeping objection was therefore too broad and might very property have been overruled on that ground. It ought to have specified the letters or parts of letters intended to be excepted to, instead of devolving on the court the necessity of looking over such a mass of letters to find out which of them the plaintiff had made evidence by reading them *336 himself, and whether any, and if any, what part of the rest was admissible evidence on any other ground. ■
We will now proceed to consider the exceptions to the report of the commissioner; and first those of the plaintiff.
The judge' then considered the exceptions seriatim upon the evidence.
Decree reversed in favor of the appellee.